Frank W. Volk
United States District Judge

**Dated: July 14th, 2020**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

| IN RE: | CASE NO. 2:20-bk-20136 |
|---|---|
| MOORE TRUCKING, INC., | CHAPTER 11 |
| Debtor. | JUDGE FRANK W. VOLK |

**MEMORANDUM OPINION AND ORDER**

Pending is the Debtor's Omnibus Motion to Require Disclosure and Rule 2004 Discovery (the "Omnibus Motion"), filed on April 26, 2020 [dckt. 19]. Interested party Douglas Moore filed two responses [dckts 26 & 67]. Additionally, creditor A.R. Walters Trucking LLC ("A.R. Walters") objected [dckt. 27]. The Debtor filed its Response to A.R. Walters' objection on May 5, 2020 [dckt. 29]. The Debtor additionally submitted its Reply to Douglas Moore's responses on May 6, 2020 [dckt. 30].

The Court has held four hearings on the Omnibus Motion: May 6, 2020, May 13, 2020, June 17, 2020, and June 24, 2020.  At the last hearing, the Court ordered the parties to file, on or before July 1, 2020, a joint report detailing what, if any information has been disclosed, what is contemplated to be disclosed, and what if anything remains in controversy.  As of July 13, 2020,

no such report has been filed.[1] The parties have been unable to come to an agreement upon the issues presented by the Omnibus Motion. The matter is fully briefed and ready for adjudication.

**I.**

Douglas and Olivia Moore were married on May 12, 2008. At that time, Douglas Moore owned a commercial vehicle and was doing business as Moore Trucking. After the couple wed, they operated in much the same way, with Douglas Moore doing business as Moore Trucking until September 2011. During that time period, they acquired commercial vehicles for the business and Mr. Moore dispatched the vehicles and operated one of the trucks.

On January 22, 2011, Douglas Moore ceased driving for Moore Trucking and instead began dispatching at the Belt Transfer terminal for A.R. Walters, Belt Transfer Company ("Belt"), Moore Trucking, Inc., and the BESL Transfer Co. ("BESL").[2] The terminal was operated by Joe McCoy, who is the President of Belt. Douglas Moore and A.R. (Randy) Walters have been acquainted for forty-three years, have worked together for over thirty years, and are close friends. Douglas Moore has known Joe McCoy for more than eighteen years. They have worked together for over eight years and are considered to be close friends.

---

[1] This direct disregard of a Court Order suggests the imposition of sanctions. The parties should be prepared to address the matter at the next hearing.

[2] The Omnibus Motion says that Douglas Moore worked as a dispatcher and driver from May 12, 2008 through July 21, 2011. It then explains that, on January 22, 2011, Douglas Moore stopped driving for Moore Trucking. The Court is unclear if the dates are intended to be July and January, or whether a mistake was made as to the timeline. Additionally, the Omnibus Motion states that the Debtor was formed in September 2011, but Douglas Moore was dispatching for it, along with other companies, in January 2011. The Court will use the dates as provided in the Omnibus Motion. This type of carelessness and inattention to detail, however, greatly, and unnecessarily, complicates the matter.

On September 16, 2011, the Moores formed the Debtor, Moore Trucking, Inc., and all the assets were transferred to the Debtor. Tax returns were prepared using handwritten summaries prepared by Mr. Moore. Olivia Moore served as the Secretary of the Corporation and Douglas Moore acted as the President. Olivia and Douglas each owned, and continue to own, 50% of the stock in the Debtor.

On July 21, 2015, the Debtor, by Douglas Moore, entered into an agreement with Randy Walters or A.R. Walters to purchase a 2005 Peterbilt Tractor for the sum of $30,000. The Debtor contends the vehicle was titled to it. Douglas Moore represented to Olivia Moore that the purchase was memorialized in a written contract, but Mr. Moore never gave her the document.

On January 25, 2017, Douglas Moore replaced Randy Walters to become the terminal manager for Belt Transfer Company, Inc.; he thus began to work under Joe McCoy's direct supervision. Also, on January 25, 2017, Mr. Moore, acting on the Debtor's behalf, purchased fourteen commercial trucks and trailers from Randy Walters for $341,000 (the "2017 Asset Purchase"). The vehicles were to be titled to the Debtor. Douglas Moore represented to Olivia Moore that the purchase was memorialized in a written contract, but Mr. Moore never gave her the document. Subsequently, on February 1, 2017, Douglas Moore directed the Debtor's accountant to place Randy Walters on the payroll and to pay him $1,065 per week, in addition to "matching costs."

In July 2018, the Internal Revenue Service ("IRS") commenced an audit of the Debtor. As part of the audit, the IRS required proof of both asset purchases listed previously (in 2015 and 2017), as the assets were being depreciated on the Debtor's books. As stated earlier, Douglas Moore had only provided handwritten summaries of the transactions and never produced any source documents. Mr. Moore finally eventually admitted to Olivia Moore that there existed

no written contracts; the purchase agreement was oral and memorialized only by the vehicle titles transferred into the Debtor's name and by liens placed on each title by A.R. Walters. Mr. Moore subsequently provided Olivia Moore with the purchase agreements attached to the Omnibus Motion as Exhibits B & C.

Thereafter, the Moores' marital relationship deteriorated, and Mr. Moore allegedly began threatening Olivia Moore that she would "never receive any of the trucking assets." Douglas Moore allegedly altered the Debtor's income stream in March 2019 by asking Belt to write checks for the Debtor's operations payable to Douglas Moore, rather than depositing the funds into the Debtor's bank accounts, as was the historical practice. Using that method, between March 1, 2019, and December 12, 2019, Mr. Moore received a total of $71,584.47 and allegedly either cashed those payments or deposited them into his personal accounts. Additionally, during substantially the same time period, Mr. Moore allegedly diverted $16,823 from the Debtor's checking account by using a debit card.

Olivia Moore discovered this information, and on December 19, 2019, she removed half of the amount on deposit in the Debtor's accounts; $1,277.45 from the corporate savings account and $28,159.39 from the checking accounts. Remaining was $29,436.84 in the checking account.

The Debtor continued to do business until January 3, 2020; Olivia Moore filed for divorce on that day. After the divorce filing, Douglas Moore opened a new account for Moore Trucking, Inc., to which Olivia Moore did not and does not now have access. Douglas Moore refused to disclose information related to the company's earnings or the contents of the account, and he continued to threaten Ms. Moore by saying she would never receive any asset from the Debtor, regardless of its status as a jointly-owned marital asset.

On March 24, 2020, in the divorce proceedings, Olivia Moore filed a disclosure (Wife's Supplemental Disclosure) which reflected, at the date of separation, the National Automobile Dealers Association ("NADA") Commercial Book Value of the rolling stock of Moore Trucking, Inc. as $526, 691.00 [dckt. 19-4, Ex. H].

On March 25, 2020, in the state court divorce proceedings, Douglas Moore filed a Motion for Expedited Modification of Order Granting Temporary Relief ("Expedited Modification Motion") [dckt. 19-4, Ex. I] seeking permission to sell the Debtor in exchange for forgiveness of $100,000.00 in debt because, he claimed, A.R. Walters would otherwise foreclose on the Debtor's assets. Attached to the motion was a document entitled "Equipment Lease Agreement with Purchase Option" ("Lease Agreement") [dckt. 19-4, Ex. J], which was dated January 25, 2017. This document was dated the same day as the 2017 Asset Purchase and included the very same assets. Olivia Moore had knowledge of the 2017 Purchase Agreement which Douglas Moore provided to her after admitting that the purchase had been made orally, but she had never before seen the Lease Agreement pertaining to the same.

Also, in support of the Expedited Modification Motion, Douglas Moore and Belt prepared an Offer to Purchase signed by Douglas Moore and Joe McCoy, which purported to provide for the purchase of all the Debtor's assets. However, this Offer listed only eleven trucks and trailers. The West Virginia Department of Motor Vehicles has on record thirty-three assets titled in the name of the Debtor (seven are owned by Moore Trucking, twenty-one are owned by the Debtor, and fourteen are titled in Douglas Moore's name, but all are believed to be the property of the Debtor).

The Debtor alleges in the Omnibus Motion that Joe McCoy and Douglas Moore are colluding with the assistance of counsel to sell the Debtor's assets, while claiming an inaccurate number of assets are subject to the transaction.

Olivia Moore's divorce attorney, Lyne Ranson, believed that the Debtor's assets could be saved through a bankruptcy filing. After contacting counsel with bankruptcy experience, Ms. Moore sent a letter to Randy Walters on behalf of A.R. Walters, Joe L. McCoy on behalf of Belt, and Douglas Moore requesting that Mr. Walters and Joe L. McCoy agree, in writing, to refrain from threatening foreclosure or repossession of the property of Moore Trucking, Inc., until the conclusion of a full investigation into the issues. [dckt. 19, Ex. N]. In the alternative, Ms. Moore also asked Douglas Moore to agree to the commencement of a Chapter 11 bankruptcy to protect Moore Trucking Inc.'s assets. [*Id.*]

Receiving no response to the letter, on March 31, 2020, Olivia Moore filed in the divorce proceedings an Emergency Motion to Alter Temporary Order to Allow the Petitioner to Authorize Bankruptcy Filing and Engagement as Counsel ("Emergency Motion"). The Family Court of Jackson County granted the Ms. Moore's Emergency Motion, and authorized Olivia Moore to vote all the corporate stock of Moore Trucking, Inc., and initiate a bankruptcy filing for the company. The Bankruptcy Petition was filed that day.

On April 1, 2020, counsel for the Debtor received the startup letter from the Office of the United States Trustee (the "UST") and subsequently requested information and documents from Douglas Moore which would assist in the preparation of schedules and transmission of information to the UST. The same day, Douglas Moore, through counsel Leah Chappell, responded with an email providing one bank statement for the new checking account (to which Olivia Moore still did not have access) but declined to provide any other requested information.

On April 2, 2020, the Debtor offered Belt and BESL designation as a critical vendor in the bankruptcy case if they would be willing to continue operating Moore Trucking, Inc.'s vehicles, provided that they make certain disclosures pertaining to contracts or agreements with the Debtor. The Debtor, on April 8, 2020, requested from Belt and BESL certain disclosures including load-ticket accountings, contracts, and agreements under which Belt and BESL operated equipment owned by the Debtor. Also requested was information regarding money paid directly to Douglas Moore and/or Moore Trucking, Inc. or any other entity as result of the operation of equipment owned by Moore Trucking, Inc. If no response was forthcoming, the Debtor informed Belt and BESL that it would seek a 2004 examination.

The Debtor caused several other letters to be sent in April to Douglas Moore (through Counsel), asking for disclosures and cooperation (including participation in the Initial Debtor Interview ("IDI") and vehicle insurance coverage for the Debtor's assets), and requesting that 2004 examinations be set with Belt, BESL, A.R. Walters, and Douglas Moore.

Joe McCoy, President of Belt, responded and indicated that he would cease all business activity with both the Debtor and Douglas Moore. He also stated that Belt would not participate in any reorganization of the Debtor and would not cooperate with any disclosure or 2004 examination requests. Douglas Moore, in kind, responded and averred that he would not provide additional documents to assist with the IDI or schedule preparation. He also provided the bare minimum information regarding vehicle insurance.

More correspondence occurred which was categorized by Douglas Moore's refusal to turn over information, refusal to cooperate in the bankruptcy case, and unwillingness to sit for a Rule 2004 examination.

Important to note is that Douglas Moore was the pre-petition custodian of all the Debtor's business records and is the only individual with access to evidence of business arrangements and transactions between A.R. Walters, BESL, Belt, and the Debtor. He also exclusively possesses all financial records relating to the Debtors, including documents which would memorialize any diverted payments.[3]

Ultimately, on April 26, 2020, the Debtor filed the Pending Omnibus Motion requesting the following relief:

1. An Order compelling Douglas Moore to turn over all originals of the Debtor's business records, including documents memorializing various business arrangements with A.R. Walters, Randy Walters, Belt, BESL, and Joe McCoy, all financial records for the Debtor, and all Department of Transportation records kept pertaining to the Debtor.

2. An Order compelling Douglas Moore to turn over and/or account for all cash assets in his position, any checks which cleared the bank on or after the date of filing, and account for all non-cash assets in possession at filing.

3. An Order compelling Douglas Moore to appear and participate in a Rule 2004 examination.

4. An Order authorizing Debtor to issue a subpoena compelling A.R. Walters to turn over every business record reflecting any transaction between A.R.

---

[3] The Court notes that, at a hearing on June 17, 2020, Douglas Moore claimed that all the documents he had pertaining to the Debtor were kept in the marital home and that he did not currently have access to that property. In contrast, Olivia Moore reported, firstly, that the documents were never originally kept in the marital home and that, even if they had been, the marital home had been sold and the documents would be in a storage unit.

Walters, the Debtor, and/or Douglas Moore, including specific documents listed in the Omnibus Motion.

5. An Order compelling a representative of A.R. Walters to submit to a Rule 2004 examination.

6. An Order authorizing Debtor to issue a subpoena compelling Randy Walters to turn over every business record reflecting any transaction between A.R. Walters, Randy Walters, the Debtor, and/or Douglas Moore, tax returns which indicate the payroll calculation for A.R. Walters, and other specific documents listed in the Omnibus Motion.

7. An Order compelling Randy Walters to submit to a Rule 2004 examination.

8. An Order authorizing Debtor to issue a subpoena compelling Belt to turn over every business record reflecting any transaction between Belt, the Debtor, and/or Douglas Moore, including checks written by Belt to the Debtor, settlement forms reflecting gross and net income for each load, and all documents regarding communications surrounding the Offer to Purchase contemplated in the divorce proceedings.

9. An Order compelling a representative of Belt to submit to a Rule 2004 examination.

10. An Order authorizing Debtor to issue a subpoena compelling Joe McCoy to turn over every business record reflecting any transaction between himself, any entity under his control, the Debtor, and/or Douglas Moore, including any and all checks written by Belt to the Debtor or Douglas Moore.

11. An Order compelling Joe McCoy to submit to a Rule 2004 examination.

12. An Order authorizing Debtor to issue a subpoena compelling BESL to turn over every business record reflecting any transaction between BESL, the Debtor, and/or Douglas Moore, including any and all checks written to the Debtor or Douglas Moore and all settlement forms reflecting the gross and net income for each load.

13. An Order compelling a representative of BESL to submit to a Rule 2004 examination.

14. An Order authorizing Debtor to issue a subpoena compelling the West Virginia Department of Motor Vehicles to provide a title history on each vehicle owned by Douglas Moore or the Debtor from 2008 to the present.

On June 19, 2020, Douglas Moore responded to the Debtor's Omnibus Motion by producing some documents the Debtor had requested: the (1) Belt Transfer Reports; (2) Belt Transfer Company's Checks to Douglas Moore; (3) City National Bank/Moore Trucking Inc.'s Account Statements; and (4) City National Bank/Moore Trucking Inc.'s Account Statements. Douglas Moore filed no further objections, but still declines to make himself available for a Rule 2004 examination as requested by the Debtor.

On May 5, 2020, A.R. Walters filed an objection to the Debtor's Omnibus Motion to Require Disclosure and Rule 2004 Discovery. [dckt. 27]. A.R. Walters contends that Rule 2004(b) of the Federal Rules of Bankruptcy Procedure is generally used for examination of the debtor and not for the examination of creditors [dckt. 27]. Further, A.R. Walters argues that a 2004 Rule examination cannot be used to "harass, abuse, or inquire into irrelevant matters." [dckt. 27 at 2]. A.R. Walters argues that the Debtor failed to explain how its requests fit within the scope of Rule 2004(b) in that the information sought is not relevant to the matter of the Debtor's estate or

right to discharge. A.R. Walters further contends that "the Rule 2004 Motion is nothing more than an attempt to launch into a wholesale investigation of A.R. Walters' private business affairs, which is not permissible under Rule 2004" [dckt. 27 at 2-3]. Therefore, A.R. Walters requested that the Court deny the Omnibus Motion "on the basis that it improperly seeks proprietary and confidential information of A.R. Walters without explaining or justifying the need for such information" [dckt. 27 at 3].

On May 5, 2020, the Debtor filed a response to A.R. Walters' objection to the Omnibus Motion [dckt. 29]. The Debtor contends that it has demonstrated good cause for conducting the requested Rule 2004 discovery because it has satisfied the burden for Rule 2004 - either that it needs discovery to establish a claim in the bankruptcy case or that the denial of the discovery would cause undue hardship or injustice. Furthermore, the Debtor contends that A.R. Walters' claim that the Debtor failed to explain how its request to examine A.R. Walters fits within the scope of Rule 2004(b) is "inconsistent with the facts of this case" [dckt. 29 at 3]. The Debtor states, "[h]ow can the information sought from a creditor who claimed a default in one of two inconsistent documents, who claims a lien when none exists[,] while receiving weekly salary from a company for which he was performing no services[,] while [the Debtor] was insolvent[,] not relate to 'any matter which may affect the administration of the debtor's estate . . . [?]'" [dckt. 19 at 3].

The Debtor additionally argues that requesting these documents is not a "wholesale investigation of A.R. Walters' private business affairs," but, rather, a request "relat[ing] to records of transactions between A.R. Walters, the Debtor, and an insider of the Debtor" [dckt. 29 at 3].

Several parties have failed to file any response to the Omnibus Motion. No responses or objections have been submitted by Randy Walters (individually), Belt, Joe McCoy, BESL, or the West Virginia Department of Motor Vehicles.

Accordingly, **IT IS ORDERED** that the Omnibus Motion be, and is hereby **GRANTED** with regards to Randy Walters, Belt, Joe McCoy, BESL, and the West Virginia Department of Motor Vehicles.

## II.

A.  Governing Standard

Under Rule 2004(a) of the Federal Rules of Bankruptcy Procedure, "[o]n motion of *any* party in interest, the court may order the examination of *any* entity." Fed. R. Bankr. P. 2004(a) (emphasis added). Rule 2004(b) governs the broad scope of the examination, providing that any probing may concern "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to *any* matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge." Fed. R. Bankr. P. 2004(b) (emphasis added). Furthermore, in a Chapter 11 reorganization case, "the examination may also relate to the operation of *any* business and the desirability of its continuance, the sources of *any* money or property acquired or to be acquired by the debtor for purposes of consummating a plan and the consideration given or offered therefor, and *any* other matter relevant to the case or to the formulation of a plan." *Id.* (emphasis added).

The primary purpose of a Rule 2004 examination is to give the parties a tool "to quickly ascertain the extent and location of the estate's assets." *In re Fearn*, 96 B.R. 135 (Bankr. S.D. Ohio 1989); *see also In re Martin*, 403 B.R. 359, 362 (Bankr. D.S.C. 2009). In addition to

discovering assets, these examinations are often used to "unearth[] frauds." *In re Table Talk, Inc.*, 51 B.R. 143, 145 (Bankr. D. Mass. 1985); *see also Martin*, 403 B.R. at 362 ("The broad general examination of debtors and others to recover assets and uncover fraudulent conduct is a traditional feature of bankruptcy jurisprudence traceable to the first bankruptcy statute enacted . . . in 1542."); *In re Symington*, 209 B.R. 678, 683 (Bankr. D. Md. 1997). The scope is "unfettered and broad" and courts sometimes describe Rule 2004 examinations as being legitimate "fishing expedition[s]." *Id.*; *Table Talk*, 51 B.R. at 145; *Fearn*, 96 B.R. at 135. Importantly, "[b]ecause Rule 2004 examinations are independent of a complaint or contested matter, the examination need not be tied to specific factual allegations and is subject to fewer objections on grounds of relevance . . . ." *Martin*, 403 B.R. at 362. However, the examination must be "relevant and reasonable." *Symington*, 209 B.R. at 684. Furthermore, it cannot be used to "harass, abuse, or to inquire into irrelevant matters," and it "should not be so broad as to be more disruptive and costly to the party sought to be examined than beneficial to the party seeking discovery. *In re Lufkin*, 255 B.R. 204, 209 (Bankr. E.D. Tenn. 2000); *Fearn*, 96 B.R. at 138; *see also In re Hammond*, 140 B.R. 197, 201 (S.D. Ohio 1992).

Typically, Rule 2004 is used to examine the debtor. However, this examination is not limited to the debtor or his agents "but may properly extend to creditors and third parties who have had dealings with the debtor." *Fearn*, 96 B.R. at 138; *In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. 803, 810-11 (Bankr. S.D.N.Y.) ("'[I]n the proper context the Court may authorize the examination of third parties that possess knowledge of the debtor's acts, conduct, liabilities, or financial condition which relate to the administration of the bankruptcy estate.'") (quoting *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002)). Summed up, "an inquiry pursuant to Rule 2004 may 'cut a broad swath through the debtor's affairs, those associated with

him, and *those who might have had business dealings with him.*'" *Id.* (quoting *In re Mantolesky*, 14 B.R. 973, 976 (Bankr. D. Mass. 1981) (emphasis in original)).

The party moving for examination has the burden of showing good cause for the examination, and the grant or denial of such request lies "within the sound discretion of the Bankruptcy Court. *In re Orion Healthcorp., Inc.*, 596 B.R. 228, 235 (Bankr. E.D.N.Y. 2019); *In re AOG Entm't, Inc.*, 558 B.R. 98, 208 (Bankr. S.D.N.Y. 2016); *In re Sunedison, Inc.*, 572 B.R. 482, 489 (Bankr. S.D.N.Y. 2017) ("Rule 2004 gives the Court 'significant' discretion.") (quoting *IN re Bd. Of Dirs. Of Hopewell Int'l Ins. Ltd.*, 258 B.R. 580, 587 (Bankr. S.D.N.Y. 2001)). Generally, an examiner may establish good cause by showing that "such an examination is reasonably necessary for the protection of its legitimate interests." *Hammond* 140 B.R. at 201; *see also AOG Entm't*, 558 B.R. at 98. The party bearing the burden of proof may satisfy the burden by demonstrating that the discovery request is necessary to establish its claim in the bankruptcy case or that denial of the discovery request would cause undue hardship or injustice to the examiner. *Orion*, 596 B.R. at 235; *see In re Metiom, Inc.* 318 B.R. 263, 268 (Bankr. S.D.N.Y 2004).

**B.      Analysis**

The Debtor has met its burden of demonstrating good cause for conducting the requested discovery. A.R. Walters relies in its objection on several cases which are not binding on this Court, and, in fact, serve to bolster the Debtor's arguments.. For example, the *In re Countrywide Home Loans* case dealt with Rule 2004 discovery sought by the UST in the case from a secured creditor. *In re Countrywide Home Loans, Inc.*, 384 B.R. 373 (Bankr. W.D. Penn. 2008).

Requested were document production and an examination of a corporate representative for the creditor. *Id.* at 378. The primary objection raised by the creditor was to the authority of the UST to conduct such an examination and compel document production; at issue was whether the 2004 request exceed the statutory scope of the UST's powers. *Id.* at 379. The creditor also objected to scope of the discovery requests, terming them a "wholesale investigation of a non-debtor's private business affairs." *Id.* After concluding that the Trustee possessed the statutory authority to request documents and examine witnesses pursuant to Rule 2004, the court briefly turned to the allowed scope of the examination. *Id.* at 392. After reiterating the "good cause" standard discussed previously herein, the court noted that "inquiries that are tightly-focused on the creditor's relationship with a particular debtor will require a relatively low level of good cause because they represent a low level of intrusion into the creditor's business affairs and a low risk of abuse." *Id.* at 393. Alternatively, "[i]nquiries that seek far-reaching information on policies and procedures of general application in the creditor's operation will require a correspondingly higher showing of good cause . . . ". *Id.* The court found that the UST had shown good cause for the production of documents such as a particular note and mortgage, loan payment history, documents related to the creditor's proof of claim, documents related to receipt and recordation of payments, and documents relating to debt collection and communication with the Debtor because "the documents at issue relate very precisely to the specific debtors' loans, the interaction between [the creditor] and each debtor, and the interaction between [the creditor] and this Bankruptcy Court." Furthermore, the documents were not those that would "implicate any private business affairs or strategies of [the creditor] . . . . and [would] not subject [the creditor] to an unfair intrusion into its private business affairs." *Id.* at 397-98.

As in the *Countrywide* matter, the Debtor here seeks only business and financial records relating precisely to its interactions with the opposing parties. No information as to the general business dealings or strategies of A.R. Walters is requested. The Debtor simply desires information which is "tightly-focused" on its business dealings with the responding parties. The above-captioned debtor in this matter would have no doubt satisfied the "good cause" standard of the *Countrywide* court.

Here, the Debtor bears the burden of demonstrating good cause for the discovery requests served on A.R. Walters and Douglas Moore. As referenced above, at issue is whether A.R. Walters holds a perfected and enforceable lien on the Debtor's assets upon which A.R. Walters could have foreclosed. While A.R. Walters claims that the Debtor is in default of a Lease Agreement, the record reflects that the Debtor acquired the equipment through a Purchase Agreement. In addition to this, A.R. Walters has been on the payroll of the Debtor, inexplicably drawing a weekly salary without demonstrating that he has performed employment duties. The inconsistency in the Debtor's equipment acquisition, along with the unexplained salary relates to "any matter which may affect the administration of the debtor's estate, or to the debtor's right to discharge" as required by Rule 2004(b).

Regarding Douglas Moore, a 50% owner of the Debtor, it is abundantly clear that Rule 2004 discovery, along with an examination, is warranted. Douglas Moore was and remains the sole record-keeper of the Debtor and was the only individual representing the Debtor in the 2017 Asset Purchase. Although later memorialized in conflicting documentation (the 2017 Asset Purchase Agreement versus the Lease Agreement), all of the Debtor's asset acquisitions were accomplished via oral contracts between Douglas Moore and Randy Walters. Furthermore, the

Debtor alleges that Douglas Moore diverted funds from the Debtor, pre-petition, using checks from the parties subject to the 2004 examination. Good cause is apparent.

Additionally, although courts may *generally* authorize examinations for debtors and not creditors, Rule 2004 is explicit in that *any* party may make a motion for an examination of any entity; the Rule may properly extend to creditors and to principals of the Debtor. In this case, the Debtor's discovery requests directly pertain to the substance of the bankruptcy proceeding, where the information the Debtor is seeking will have a meaningful impact on the case. A.R. Walters alleges that the request is not relevant to the Debtor's estate or right to discharge and that the Debtor has not met its burden. Unsurprisingly, A.R. Walters offers no reasoning for this allegation, as his financial interactions with the Debtor are inarguably and clearly relevant.

Furthermore, A.R. Walters alleges that the discovery request is a baseless attempt to unnecessarily dive into his private business records. To the contrary, the request is narrowly tailored to A.R. Walters' dealings with the Debtor and ripe for investigation.

Therefore, Debtor Moore Trucking, Inc. has demonstrated good cause for a discovery request under Rule 2004. Accordingly,

**IT IS ORDERED** that the Debtor's Omnibus Motion to Require Disclosure and Rule 2004 Discovery, as to A.R. Walters and Douglas Moore, be, and hereby is, **GRANTED**.

Further, the Debtor and interested parties are **NOTICED** that the Court will not tolerate unnecessary delay, procrastination, or, worse yet, prevarication and subterfuge from any entity involved in this case. The prospect for such is elevated given the apparent mistrust and animus that has arisen between the interested parties. Upon proper proof, the Court will issue the necessary process directing insubmissive individuals to promptly show cause for their

noncompliance, with appropriate sanctions to follow. The Court further invites the UST to make all necessary inquiries, participate fully in the Rule 2004 examinations and request further such inquiries he deems warranted, and, if indicated, and in his discretion, exercise his referral authority.